AFM:MS
F. #2024R00943

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

IURII GUGNIN,
 also known as "Iurii Mashukov"
 and "George Goognin,"

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GRAND JURY CHARGES:

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
*  JUNE 6, 2025   *
BROOKLYN OFFICE

I N D I C T M E N T

Cr. No. 25-CR-191
(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
982(a)(1), 982(a)(2), 982(b)(1), 1343,
1344, 1349, 1956(a)(2)(A),
1956(a)(2)(B), 1956(h), 1960(b)(1)(C),
2, and 3551 *et seq*.; T. 21, U.S.C., §
853(p); T. 28, U.S.C., § 2461(c); T. 31,
U.S.C., §§ 5318(g), 5322(a), and
5322(b); T. 50, U.S.C., §§ 1705(a) and
1705(c); T. 31, C.F.R., §§ 587.201,
1022.210, and 1022.320)

Judge Nina R. Morrison
Magistrate Judge Taryn A. Merkl

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

### I.    The Defendant and Relevant Entities

1.    The defendant IURII GUGNIN, also known as "Iurii Mashukov" and

"George Goognin," was a national of the Russian Federation ("Russia") who resided in the

United States pursuant to an O-1A visa.    GUGNIN moved to the United States on or about July

29, 2022, and resided in New York, New York.    GUGNIN portrayed himself as a serial

entrepreneur and expert in financial technology, or "fintech."    GUGNIN was the founder,

President, Treasurer, and Compliance Officer of Evita Investments, Inc. ("Evita Investments")

and Evita Pay, Inc. ("Evita Pay") (collectively "Evita").

2.      Evita Investments was incorporated in Delaware on or about November

24, 2021.   Evita Investments had never registered as a money services business ("MSB") with

the Financial Crimes Enforcement Network ("FinCEN") or any state licensing agency.

3.      Evita Pay was incorporated in the state of Florida on or about June 14,

2023.   On or about June 23, 2023, Evita Pay registered as an MSB with FinCEN.   Nearly one

year later, on or about June 4, 2024, Evita Pay received a money transmitter license from the

State of Florida Office of Financial Regulation.

II.      Statutory and Regulatory Background

A.      Background Regarding the International Emergency Economic Powers Act and
            Russia Sanctions Regulations

4.      The International Emergency Economic Powers Act ("IEEPA"), which is

set forth at Title 50, United States Code, Sections 1701–1710, authorizes the President of the

United States to impose economic sanctions in response to an unusual and extraordinary threat to

the national security, foreign policy, or economy of the United States when the President

declares a national emergency with respect to that threat.   Pursuant to the authority under

IEEPA, the President and the executive branch have issued orders and regulations governing and

prohibiting certain transactions with certain countries, entities, and individuals by U.S. persons

or involving U.S.-origin goods.

5.      On or about April 15, 2021, pursuant to his authorities under IEEPA, the

President issued Executive Order 14024, which declared a national emergency with respect to

specified harmful foreign activities of the Government of Russian, including, as relevant here, its

efforts "to undermine security in countries and regions important to United States national

security; and to violate well-established principles of international law, including respect for the

territorial integrity of states."   *See* E.O. 14024 (Apr. 15, 2021), 86 Fed. Reg. 20,249 (Apr. 19,

2

2021). To address this national emergency, the President blocked the property and interest in property of certain persons determined by the Secretary of the Treasury to meet one or more enumerated criteria.

6.      Executive Order 14024 prohibits, among other things, the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to the Order, and the receipt of any contribution or provision of funds, goods, or services from any such person, *see* E.O. 14024 § 2; and any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the Order's prohibitions, and any conspiracy to violate the Order's prohibitions, *see* E.O. 14024 § 4.

7.      To implement Executive Order 14024, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued the Russian Harmful Foreign Activities Sanctions Regulations, which incorporate by reference Executive Order 14024's prohibitions. *See* 31 C.F.R. § 587.201. The regulations provide that the names of persons designated by OFAC pursuant to Executive Order 14024, whose property and interests are therefore blocked, are published in the Federal Register and incorporated into the Specially Designated Nationals ("SDN") and Blocked Persons List (the "SDN List"), which is published on OFAC's website. *See id.* note 1.

8.      Pursuant to Title 50, United States Code, Section 1705(c), it is a criminal offense to willfully violate, attempt to violate, conspire to violate, or aid and abet a violation of any license, order, regulation, or prohibition issued under IEEPA.

3

B.    Background Regarding the Export Control Reform Act and Export
      Administration Regulations

9.    The Export Administration Regulations ("EAR"), which are set forth at

Title 15, Code of Federal Regulations, Parts 730–774, were promulgated by the Department of

Commerce's Bureau of Industry and Security ("BIS") to regulate the export of goods,

technology, and software from the United States.   Through the EAR, the BIS reviews and

controls the export from the United States to foreign countries of certain U.S. items.   *See* 15

C.F.R. §§ 734.2–.3.   In particular, the BIS has placed restrictions on the export and reexport of

items that it has determined could make a significant contribution to the military potential or

nuclear proliferation of other nations or that could be detrimental to the foreign policy or national

security of the United States.   Under the EAR, such restrictions depend on several factors,

including the technical characteristics of the item, the destination country, the end user and the

end use.

10.    The most sensitive items subject to the EAR controls are identified on the

Commerce Control List ("CCL"), set forth in Title 15, Code of Federal Regulations, Part 774,

Supplement Number 1.   Items listed on the CCL are categorized by Export Control

Classification Number ("ECCN"), each of which is subject to export control requirements

depending on destination, end use and end user.

11.    In response to Russia's February 2022 invasion of Ukraine, the DOC

imposed new license requirements on exports to Russia.   As of on or about February 24, 2022,

any item classified under any ECCN in Categories 3 through 9 of the CCL required a license to

be exported to Russia.   *See* 87 Fed. Reg. 12,226 (Mar. 3, 2022).   As of April 8, 2022, the

license requirement for export to Russia was expanded to cover all items on the CCL.   *See* 87

Fed. Reg. 22,130 (Apr. 14, 2022).   These rules were codified in Title 15, Code of Federal

Regulations, Section 746.8, which states that "a license is required, excluding deemed exports and deemed reexports, to export, reexport, or transfer (in-country) to or within Russia or Belarus any item subject to the EAR and specified in any Export Control Classification Number (ECCN) on the CCL." Export license applications for items on the CCL are reviewed under a policy of denial, except for specified categories of items reviewed on a case-by-case basis. *See id.* § 746.8(b)(3).

12.    Pursuant to Export Control Reform Act ("ECRA"), it is a crime to violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or authorization issued pursuant to the statute, including the EAR. *See* 50 U.S.C. § 4819(a)(1).

C.    Background Regarding Cryptocurrency and the Bank Secrecy Act

13.    Cryptocurrencies, such as Bitcoin, Ethereum or Tron, use an internet-based infrastructure of nodes to store a public ledger of transactions. When a user acquires cryptocurrency, ownership of that cryptocurrency is transferred to the user's address. The address is analogous to a bank account number. The user can then conduct transactions with other users by transferring cryptocurrency to their cryptocurrency addresses, via the internet.

14.    Cryptocurrency transactions are typically recorded on what is known as the "blockchain" for the relevant cryptocurrency. The blockchain is a distributed public ledger that tracks transactions for a particular cryptocurrency. The blockchain records every address that has ever received that particular cryptocurrency and maintains records of every transaction for each address.

15.    A stablecoin, such as "USDT" (commonly known as "Tether"), is a type of digital currency that is designed to maintain a stable value relative to a reserve asset—in the case of Tether, the U.S. dollar.

5

16.     Title 18, United States Code, Section 1960 prescribes criminal penalties for anyone who "knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business."

17.     The statute defines the term "unlicensed money transmitting business" to mean a money transmitting business that affects interstate or foreign commerce in any manner or degree and that either "is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable," 18 U.S.C. § 1960(b)(1)(A); "fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section," 18 U.S.C. § 1960(b)(1)(B); or "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity," 18 U.S.C. § 1960(b)(1)(C).

18.     The "regulations" referenced in 18 U.S.C. § 1960(b)(1)(B) define a "money services business" ("MSB") as "[a] person wherever located doing business, whether or not on a regular basis or as an organized or licensed business concern, wholly or in substantial part within the United States, in" one or more specific capacities—including as a "money transmitter." 31 C.F.R. § 1010.100(ff). The term "[m]oney transmitter," in turn, includes anyone who "accept[s] . . . currency, funds, or other value that substitutes for currency from one person and . . . transmit[s] . . . currency, funds, or other value that substitutes for currency to another location or person by any means," as well as "[a]ny other person engaged in the transfer of funds." 31 C.F.R. §§ 1010.100(ff)(5)(i)(A)-(B).

6

19.     All MSBs are required to register with FinCEN, a division of the U.S.

Department of Treasury, unless specific exemptions apply.   31 C.F.R. § 1022.380(a)(1).   In

addition, MSBs are required to comply with certain aspects of the Bank Secrecy Act, such as

filing reports of suspicious transactions, 31 U.S.C. § 5318(g); 31 C.F.R. § 1022.320(a); and

implementing an effective anti-money-laundering ("AML") program, 31 C.F.R. § 1022.210.   An

effective AML program is described as "one that is reasonably designed to prevent the money

services business from being used to facilitate money laundering and the financing of terrorist

activities."   31 C.F.R. § 1022.210(a).   Under the regulations, an AML program must, at a

minimum, "[i]ncorporate policies, procedures, and internal controls reasonably designed to

assure compliance" with an MSB's obligations to verify customer identification, file reports,

creating and retain records, and respond to law enforcement requests.   31 C.F.R.

§ 1022.210(d)(1).   The obligation to verify customer identification is frequently referred to as a

"know your customer," or "KYC," requirement.   Pursuant to Title 31, United States Code,

Section 5322, it is a criminal offense to willfully violate the Bank Secrecy Act or any regulation

prescribed or order issued under the act.   31 U.S.C. §§ 5322(a)-(b).

20.     In 2013, FinCEN issued guidance stating that the definition of a money

transmitter includes an individual who offers exchange services between virtual currency and fiat

currency.   *See* Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations*

*to Persons Administering, Exchanging, or Using Virtual Currencies*, FIN-2013-G001 (Mar. 18,

2013) (the "FinCEN Guidance").   The FinCEN Guidance stated, among other things, that those

who are money transmitters because they offer exchange services between virtual currency and

fiat currency also come within the regulations applicable to MSBs.   That guidance was

reaffirmed in May 2019.   *See* Dep't of the Treasury FinCEN Guidance, *Application of*

7

*FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*,
FIN-2019-G001 (May 9, 2019).

III.    Overview of the Criminal Scheme

21.    Since at least in or about July 2022, the defendant IURII GUGNIN
conspired with others, known and unknown to the Grand Jury, in an unlawful scheme to
facilitate overseas individuals' and entities' access to the U.S. financial system, in many cases to
further illicit conduct.   In the process, GUGNIN defrauded banks and other financial services
institutions, evaded financial sanctions and export controls, and violated the Bank Secrecy Act.
Over the course of the scheme, GUGNIN facilitated nearly $2 billion worth of transactions,
ultimately funneling more than $500 million of overseas payments through the United States
while masking the source of the funds and their true owners.   Many of GUGNIN's customers
were located in Russia and held funds in sanctioned Russian banks.   While present in the United
States, GUGNIN willfully facilitated transactions in those funds despite knowing the banks were
subject to OFAC sanctions.   GUGNIN himself also maintained funds at sanctioned Russian
banks and transacted in those funds while residing in the United States.

22.    The defendant IURII GUGNIN effectuated his scheme through Evita,
which purported to provide cross-border cryptocurrency payment and import-export services.
In addition to Russia, Evita's business also involved China, South Korea, India, Türkiye, Hong
Kong, Singapore, the United Arab Emirates, and other countries.   GUGNIN used the money
laundered through Evita, among other things, to evade sanctions, facilitate the procurement of
sensitive U.S.-made electronics by foreign entities, and enable the purchase of equipment by a
Russian nuclear energy company.   As part of the scheme, GUGNIN lied to multiple U.S.
financial institutions and cryptocurrency exchanges, including about Evita's AML compliance

8

programs, its business activities in Russia, and its dealings with funds held in sanctioned bank

accounts, all to obtain property from the financial institutions and cryptocurrency exchanges.

GUGNIN also obtained under false pretenses a money transmitting license from the State of

Florida Office of Financial Regulation that GUGNIN used to open and maintain an account at a

cryptocurrency exchange.    And while operating Evita, GUGNIN deliberately failed to file

suspicious activity reports or implement Evita's own purported AML compliance programs.

IV.      The Defendant's Operation of Evita

23.      The defendant IURII GUGNIN described Evita Investments as an import-

export facilitator and cross-border business-to-business lender that enabled entities located

abroad to pay a fee to provide upfront payment to U.S. manufacturers for a pre-determined

shipment of goods.    GUGNIN described Evita Pay as a money transmitter and dealer in foreign

exchange that provided global cross-border payment and currency exchange services to

individuals and entities in both fiat currency and cryptocurrency.

24.      In reality, the defendant IURII GUGNIN used both companies to enable

foreign customers, many of whom held funds at sanctioned banks overseas, to provide GUGNIN

with cryptocurrency, which GUGNIN then laundered through cryptocurrency wallets and U.S.

bank accounts.    GUGNIN ultimately converted the funds into U.S. dollars or other fiat

currencies, and then made payments from or through bank accounts in New York, New York, on

behalf of his foreign customers.    In the process, the funds were disassociated from their source,

disguising the audit trail and, in many cases, the identities of GUGNIN's true customers.

25.      The defendant IURII GUGNIN maintained private, detailed ledgers of the

volume and nature of Evita's transactions.    Each entry on the ledger typically documented the

inflow and outflow of funds, the type of currency received or exchanged, the financial account

9

used, and, in many cases, the true identities of his customers as indicated by their initials. GUGNIN ultimately used accounts and cryptocurrency wallets he controlled to send these funds, less fees that he retained, as payments for various products and services on behalf of his customers. These payments included funds sent to vendors and bank accounts located in the Eastern District of New York, as well as funds sent via wire and bank transfers that passed through the Eastern District of New York.

26.    The majority of the defendant IURII GUGNIN's customers were individuals and entities located abroad, including in Russia, China, and the United Arab Emirates. GUGNIN received service requests from customers via an encrypted messaging platform, either through a direct line available on Evita's website, or through a heavily trafficked virtual private server, where a "bot" automated the creation of invoices for GUGNIN's approval.

27.    In or about and between June 2023 and January 2025, GUGNIN used Evita to facilitate the movement of approximately $530 million through the U.S. financial system. No less than approximately $166 million of these funds originated in U.S. dollars and no less than approximately $365 million of these funds originated in Tether, or "USDT." The vast majority of these transactions were associated with Evita Investments, rather than Evita Pay.

A.    Wire Fraud and Bank Fraud Scheme

28.    As noted, the defendant IURII GUGNIN's scheme involved providing payment for goods and services on behalf of overseas clients, including entities who provided GUGNIN with funds held in OFAC-sanctioned banks. To conceal his operation, GUGNIN made materially false statements to cryptocurrency exchanges and banks about Evita's business, which enabled him to obtain property from the cryptocurrency exchanges and banks. This included providing false AML and/or KYC documentation in which GUGNIN denied doing

10

business with entities in Russia, as well as making false statements about Evita's compliance processes, the true counterparties to particular transactions, Evita Investment's purported exemption from money transmitting business registration requirements, and whether Evita complied with financial sanctions. GUGNIN also made false statements about Evita Pay's business to the State of Florida Office of Financial Regulation to obtain a money transmitter license, which he then used to induce a cryptocurrency exchange to open and maintain an account for Evita Pay and provide GUGNIN with property, including fiat currency and cryptocurrency.

      i.      Materially False Statements to Banks and Cryptocurrency Exchanges

      29.      The defendant IURII GUGNIN frequently made false statements or omitted key details when interacting with banks and cryptocurrency exchanges. Often, these false statements or omissions related to Evita's business in Russia and were in service of GUGNIN's scheme to evade U.S. sanctions and export controls by providing customers in Russia with a means of accessing the U.S. financial system, including through wire payments that passed through the Eastern District of New York.

      30.      For example, on or about May 10, 2023, the defendant IURII GUGNIN provided a U.S.-based cryptocurrency exchange ("Cryptocurrency Exchange 1") with a KYC/AML compliance document for Evita Investments to facilitate the opening of a business account. This compliance document was signed by GUGNIN and included statements certifying a range of internal compliance controls Evita Investments would purportedly undertake while doing business on Cryptocurrency Exchange 1's platform. Among other policies, the signed compliance document stated that Evita Investments was prohibited from doing business with customers located in a host of countries, including Russia.

11

31.    The chart below summarizes additional false statements the defendant

IURII GUGNIN made to financial institutions and cryptocurrency exchanges:

| APPROXIMATE DATE | INSTITUTION | FALSE STATEMENT |
|---|---|---|
| May 25, 2023 | Payments Company 1 | Provided false KYC/AML documentation that indicated Evita Investments was prohibited from doing business with customers in Russia; indicated Evita Investments was exempt from FinCEN/state MSB licensing as a "US private hedge fund" |
| June 21, 2023 | Cryptocurrency Exchange 3 | Provided false KYC/AML documentation that indicated Evita Investments was prohibited from doing business with customers in Russia; provided false due diligence questionnaire that stated Evita Investments did not offer cross-border remittance services, misidentified top customer jurisdictions, indicated Evita Investments did not "transmit funds or cryptocurrency on behalf of customers," and falsely stated Evita was exempt from licensing requirements |
| July 27, 2023 | Cryptocurrency Infrastructure Company 1 | Provided false KYC/AML documentation that indicated Evita Investments was prohibited from doing business with customers in Russia |
| October 3, 2023 | Cryptocurrency Exchange 2 | Provided false on-boarding application that indicated Evita Investments did not transact with customers in Russia |
| October 13, 2023 | Bank 1 | Made false statements to representatives indicating that Evita Investments did not deal with clients, partners, resellers, or vendors in Russia, nor transacted with any Russian banks |
| December 20, 2023 | Bank 3 | Provided false sanctions due diligence questionnaire that indicated Evita Investments did not "conduct business activity in, or have indirect exposure to" Russia |
| December 22, 2023 | Bank 2 | Made false statements about countries involved in Evita Investments' business, including by omitting Russia |

| APPROXIMATE DATE | INSTITUTION | FALSE STATEMENT |
|---|---|---|
| March 14, 2024 | Payments Company 2 | Provided false KYC/AML documentation that indicated Evita Investments was prohibited from doing business with customers in Russia |
| April 10, 2024 | Bank 4 | Provided document titled "Evita Pay Inc. Restricted Countries List" that falsely indicated Evita Pay did not transact with customers in Russia |
| July 9, 2024 | Payments Company 3 | Provided false KYC/AML documentation that indicated Evita Investments was prohibited from doing business with customers in Russia; falsely indicated Evita Investments was exempt from licensing requirements; and made false statements concealing involvement of Russian entities in particular transactions |

32. Despite the above statements, the defendant IURII GUGNIN, through Evita, frequently transacted with Russian entities and customers, often obfuscating invoices to conceal their Russian identities.

33. For example, the defendant IURII GUGNIN facilitated the purchase of artwork from an auction house based in the Eastern District of New York for a customer identified as "TI." GUGNIN first used Evita Investments' account at Cryptocurrency Exchange 1 to convert USDT received from "TI" to U.S. dollars, then transferred the U.S. dollars into Evita Investments' account at Bank 1. GUGNIN then used those funds to purchase approximately $43,450.00 worth of artwork from the auction house. An invoice maintained by GUGNIN identified the transaction as being conducted on behalf of "TI." At first glance, the invoice appeared to lack an addressee. The invoice's metadata, however, revealed that GUGNIN intentionally obfuscated the invoice by digitally "whiting out" the customer's identity. Reversing this alteration revealed that GUGNIN's true customer was a Russia-based individual with a listed address in Moscow, Russia and an ".ru" (Russia-designated) email address.

13

34.     In another instance, the defendant IURII GUGNIN provided a falsified

invoice to Payments Company 3 to retrieve a rejected payment on behalf of a Russian customer.

(a)     On or about December 3, 2024, a Russia-based individual used

Evita to make three approximately 50,000.00 Euro payments from Russia to a French yacht

company.   The Russia-based individual had previously agreed to wire three 50,000.00 Euro

payments to GUGNIN through a Russian-based money transmission service.   Then, in exchange

for a fee, GUGNIN had agreed to make three 50,000.00 Euro payments from GUGNIN's

account at Payments Company 3 to the French yacht company.

(b)     However, on or about November 27, 2024, Payments Company 3

placed one of the payments on hold.   After GUGNIN informed the Russia-based individual that

he would work on the issue, the Russia-based individual responded, "this is great news. But

please repeat my payment today through other operators. What should I wait for? I've already

waited for mine."   GUGNIN, in turn, gave the Russia-based individual the following choices:

> I am the operator, not the middleman :). We can either return the
> tether or ask you for documents about who is the first buyer of the
> service for EUR 50,000 in the chain (not from the CIS)

"CIS" is a reference to the Commonwealth of Independent States, a group of former Soviet

Union member countries.   In or about the same time, GUGNIN contacted Payments Company 3

to inquire about the status of the blocked wire.   Payments Company 3 indicated that

> it looks like this got caught in compliance in Europe. Could you
> please answer the following questions: please provide a detailed
> explanation of the payment, the named countries of all travel
> destinations    (as    applicable),    country    of    the    final
> destination/origination of funds, copy of the invoice (if applicable).

(c)     In a separate email, GUGNIN shared these questions with the

Russia-based individual, who responded by, among other things, providing GUGNIN with an

14

invoice.   In response, GUGNIN insisted, "please send an invoice or contract where your address

is not in Stavropol Krai but in Montenegro."   Stavropol Krai is a region in Russia.   The Russia-

based individual responded that he would "redo" the invoice so that the address reflected a

location in Montenegro, not in Stavropol Krai.   After GUGNIN provided the falsified invoice to

Payments Company 3, Payments Company 3 lifted the hold and the payment was effectuated.

   35. As a third example, in or about and between July 2023 and December

2024, the defendant IURII GUGNIN, through Evita Investments, received approximately

69,231,024.00 in USDT and approximately $22,528,270.00 in U.S. dollars from a Russia-based

cross-border payments company.

   ii. Scheme to Open Cryptocurrency Exchange Account under False Pretenses

   36. The defendant IURII GUGNIN also made materially false statements to

the State of Florida Office of Financial Regulation to induce that office to grant Evita Pay a

money transmitter license.   In emails and signed documents that GUGNIN provided to the state

of Florida, he intentionally misrepresented Evita Pay's projected volume of money transmission

and misrepresented the currencies Evita Pay intended to exchange for its customers.

   37. On or about October 17, 2023, after the defendant IURII GUGNIN had

submitted an initial application that included a projection of Evita Pay's total U.S. dollar volume

of money transmission, a representative of the State of Florida Office of Financial Regulation

instructed GUGNIN to submit revised projections.   The representative wrote, "Please be

mindful, your projections should be for the quarters after licensure has been granted.   Please

submit an updated surety bond if necessary."[1]

---

   [1] To obtain a money transmitter license from the State of Florida Office of
Financial Regulation, an applicant "must provide to the office a corporate surety bond, issued by

15

38.    On or about October 20, 2023, the defendant IURII GUGNIN contacted an employee of an insurance brokerage to inquire about the possibility of increasing Evita Pay's surety bond from $100,000.00 to $2 million.   In his email, GUGNIN explained that he had calculated the $2 million bond figure based on a projection of $230 million in business across three quarters of Evita Pay's operation.   After the employee clarified that he would not be able to handle an increase of that size and that the maximum bond value he could offer was $100,000.00, GUGNIN responded that he would instead "adjust our projections."   GUGNIN then emailed Florida authorities and provided a false, drastically revised estimate of Evita Pay's expected volume of business.   GUGNIN falsely stated that he estimated that, after obtaining a Florida money transmitter license, Evita Pay would transmit about $0 in the first quarter, $2 million in the second quarter, and $3 million in the third quarter, such that the required surety bond would be about $100,000.00.   This estimate was approximately 2% of the $230 million estimate that GUGNIN had initially presented to the insurance brokerage.

39.    Previously, on or about September 19, 2023, the defendant IURII GUGNIN had presented Bank 4 with a business plan document for Evita Pay with a third figure. GUGNIN stated that, in the year 2024, Evita Pay was projected to process $1 billion U.S. dollars' worth of payments.

40.    Aside from projected business volume, representatives from the Florida State Office of Financial Regulation also asked the defendant IURII GUGNIN to provide a list of all foreign currencies Evita Pay intended to exchange.   On or about December 7, 2023, GUGNIN provided the following list: USD, EUR, GBP, AED, CNY, JPY, KRW, HKD, SGD,

---

a bonding company or insurance company authorized to do business in this state."   Florida Statutes Section 560.209.

BRL, ARS, MXN.   GUGNIN omitted from the list the fact that Evita Pay would transact frequently in Russian Rubles, Nigerian Naira, and Indian Rupees, that Evita Pay possessed bank accounts in India and Russia, and that Evita Pay had filed incorporation documents in India.

41.     After obtaining the money transmitter license for Evita Pay based on false pretenses, the defendant IURII GUGNIN then relied on the fraudulently obtained license to open accounts at cryptocurrency exchanges.   For example, KYC/AML review documents maintained by Cryptocurrency Exchange 2 dated on or about October 11, 2023, stated that Evita Pay was "currently working on Money Transmitter License for FL, it's currently not complete and under review with the FL Investigators. The onboarding process has been completed. However, Evita Pay cannot conduct business with [Cryptocurrency Exchange 2] unless they are issued the MTL from FL."   Thereafter, on or about June 4, 2024, GUGNIN sent Cryptocurrency Exchange 2 an e-mail stating that "we finally did it :). Attached is our FL MTL."   Attached to the e-mail was a copy of Evita Pay's Florida money transmitter license.   On the same day, a representative of Cryptocurrency Exchange 2 responded to GUGNIN's e-mail and said "great news, congratulations! The onboarding for Evita Pay Inc. is officially completed and opened. Welcome to the [Cryptocurrency Exchange 2] Team and happy trading."   Cryptocurrency Exchange 2 ultimately opened an account for Evita Pay, through which Evita Pay obtained property and engaged in more than $30 million in transactions.   GUGNIN later transferred funds from that account to bank accounts located in New York, New York, and then wired the funds from those bank accounts through the Eastern District of New York.

B.     <u>Sanctions Evasion Scheme</u>

42.     The defendant IURII GUGNIN also violated IEEPA by (1) facilitating payments from OFAC-sanctioned Russian banks on behalf of his customers, and (2) utilizing his

own bank accounts at OFAC-sanctioned Russian banks—all while residing in the United States. At no times relevant to the Indictment did GUGNIN or Evita have a license from OFAC to engage in transactions with sanctioned entities.

>           i.        Payments on Behalf of Yiwu Vortex Import and Export Co., Ltd.

43.       On or about October 16, 2023, the defendant IURII GUGNIN entered into a contract with Hong Kong-based cross-border goods distributor Yiwu Vortex Import and Export Co., Limited ("Yiwu Vortex")[2] that permitted Evita Investments, for a fee, to send and receive payment on Yiwu Vortex's behalf.   GUGNIN thereafter facilitated payments for Yiwu Vortex that involved funds held at OFAC-sanctioned Russian banks.

>           a.        Payments to South Korean Company

44.       For example, on or about March 21, 2024, the Director of Yiwu Vortex sent the following email to the defendant IURII GUGNIN and the director of a Moscow-based supplier of equipment used in nuclear energy, traditional energy, and other industrial facilities:

> Good morning!
>
> The rate of 92.3 has been fixed according to your request.
>
> Calculation:
> $100,000.00 * 92.3 + 7% = 9,876,100.00 RUB (9,230,000.00 + 646,100.00 RUB remuneration)
>
> Please fill out the order on your part and send it signed in the reply letter. Then, after the order has been signed by both parties, you can begin payment.
>
> *Please note, payment to Sberbank, in the near future we will send an additional agreement on changing the details for signature.

---

[2]       Yiwu Vortex was later added to OFAC's SDN list on or about October 30, 2024, for illicitly exporting maritime equipment to Russia.

45.     Attached to the e-mail was a contract between the Moscow-based supplier and Yiwu Vortex, according to which the Moscow-based supplier agreed to transfer the above-mentioned sum, 9,230,000.00 RUB, to Yiwu Vortex's bank account at PJSC Sberbank ("Sberbank").   On or about April 6, 2022, OFAC designated Sberbank pursuant to Executive Order 14024 and added it to the SDN List for "operating or having operated in the financial services sector of the Russian Federation economy."   According to the contract, after the 9,230,000.00 RUB were transferred to Yiwu Vortex's account at Sberbank, Yiwu Vortex would then pay the equivalent amount in U.S. dollars—$100,000.00—to a South Korean company on behalf of the Moscow-based supplier.

46.     On or about and between March 21, 2024, and March 22, 2024, the defendant IURII GUGNIN, the Director of Yiwu Vortex, the Director of the Moscow-based supplier, and a fourth individual, communicated via email to facilitate the payment.   After amending their agreement to clarify the South Korean Company's bank details, the fourth individual sent an email to the Director of Yiwu Vortex and carbon copied GUGNIN and the Director of the Moscow-based supplier, noting that "payments are attached."   The email included two documents detailing wire payments from the Moscow-based supplier's account at PJSC Sovcombank ("Sovcombank") to Yiwu Vortex's account at Sberbank.   Like Sberbank, OFAC designated Sovcombank pursuant to Executive Order 14024 and added it to the SDN List on or about February 24, 2022 for "operating or having operated in the financial services sector of the Russian Federation economy."   Ultimately, the Director of Yiwu Vortex confirmed that payments of 9,230,000.00 RUB and 646,100.00 RUB were received into Yiwu Vortex's account with Sberbank.

47.      Thereafter, despite knowing that the transaction involved funds moving through two sanctioned Russian banks, the defendant IURII GUGNIN willfully facilitated the final portion of the transaction by receiving funds in cryptocurrency, converting the funds into U.S. dollars, and wiring the funds to the South Korean company.   Specifically, on or about March 22, 2024, the same date GUGNIN was copied on an email from the Director of Yiwu Vortex confirming receipt of payment to its Sberbank account, a cryptocurrency wallet controlled by GUGNIN received a transfer of approximately 104,860.00 USDT—the equivalent value in Tether, plus fees, of the 9,230,000.00 RUB and 646,100.00 RUB payments received into Yiwu Vortex's Sberbank account.   On the same day, GUGNIN sent the approximately 104,860.00 USDT to a wallet hosted by Cryptocurrency Exchange 2.   Cryptocurrency Exchange 2 then exchanged the USDT into U.S. dollars and wired the funds to Evita Investments' bank account held at Bank 2 in New York, New York.   On or about March 25, 2024, GUGNIN sent an approximately $100,000 international wire transfer from the account held at Bank 2 to an account held at a bank in South Korea and controlled by the South Korean company.   The international bank transfer passed through the Eastern District of New York.   The $4,860 difference accounted for fees paid to Cryptocurrency Exchange 2, GUGNIN, and a Switzerland-based cryptocurrency trading platform.

48.      Several days later, on or about March 28, 2024, the defendant IURII GUGNIN facilitated a larger payment—approximately $1,054,280.00—using similar means from the Moscow-based supplier to the South Korean company.   This payment again involved transfers to Yiwu Vortex's account at Sberbank, and it again involved an international bank transfer by GUGNIN through the Eastern District of New York.   The contract for this transaction specified that the South Korean company would supply the Moscow-based supplier

20

with equipment, parts, and other items.   The Moscow-based supplier would then provide the items to two Russian entities which collectively make up the Engineering Division of Russia's State Atomic Energy Corporation Rosatom ("Rosatom").[3]

49.     In or about and between February 2022 and February 2024—before the above payments took place— the defendant IURII GUGNIN conducted web searches for, among other things, "ofac sanctions"; "ofac sanctions screening"; and "sdn list."   He also visited OFAC's website multiple times during that period, including the "Ukraine/Russia-related Sanctions" page of OFAC's website and a page titled "OFAC's Russia-related designations and designations updates page."

b.     Payment to China-Based Company

50.     On or about April 26, 2024, the defendant IURII GUGNIN signed a contract to facilitate an $85,023.28 U.S. dollar payment on behalf of Yiwu Vortex to a China-based company.   Under the agreement, Yiwu Vortex would initiate the payment by transferring funds to Evita Investments from a bank account at PJSC VTB Bank ("VTB Bank").   On or about February 24, 2022, OFAC designated VTB Bank pursuant to Executive Order 14024 and added it to the SDN List for "being owned or controlled by, or for having acted or purported to act for or on behalf of, directly or indirectly, the [Government of Russia], and for operating or having operated in the financial services sector of the Russian Federation economy."   The agreement stated that the payment was in support of a contract between Yiwu Vortex and a Russian wholesale provider of optical goods, electrical household appliances, and consumer electronics.   On or about April 27, 2024, a cryptocurrency wallet controlled by GUGNIN

---

[3]     While Rosatom itself is not subject to full blocking sanctions, nearly 70 Rosatom subsidiaries, employees, and/or board members have been added to the SDN List.

21

received approximately $253,082.89 USDT from Yiwu Vortex. Thereafter, on or about April 29, 2024, GUGNIN sent approximately $85,023.28 U.S. dollars via international bank transfer from an account held at Bank 2 in New York, New York, to an account held at Bank 2 in Singapore and controlled by the China-based company. That bank transfer, which was part of a transaction involving funds at VTB Bank, passed through the Eastern District of New York.

c.    <u>Payment to Türkiye-Based Company</u>

51.    On or about February 15, 2024, the defendant IURII GUGNIN signed a contract to facilitate a $64,082.00 U.S. dollar payment on Yiwu Vortex's behalf to a Türkiye-based company. Like the payments to the South Korea- and China-based companies, the payment to the Türkiye-based company began with a transfer from an account at a sanctioned Russian bank—here, VTB Bank. According to the agreement signed by GUGNIN, which identified the account at VTB Bank, the payment was for the benefit of a Russian wholesale trader of industrial machines, devices, and equipment. Despite knowing that the payment involved funds from a sanctioned Russian bank account, on or about February 19, 2024, GUGNIN sent the approximately $64,082.00 payment via international wire from an account held at Bank 2 in New York, New York, to an account held at a bank in Türkiye controlled by the Türkiye-based company. The payment was processed through a correspondent account at another New York-based bank and passed through the Eastern District of New York.

d.    <u>Payment to California-Based Manufacturer of Smart Watches</u>

52.    In or about and between November 2023 and December 2023, the defendant IURII GUGNIN signed a series of contracts agreeing to make six payments totaling approximately $45,000.00 on behalf of Yiwu Vortex to a California-based manufacturer of smart watches. The funds for these payments originated at JSC Tinkoff Bank ("Tinkoff Bank"). On

22

or about July 20, 2023, OFAC designated Tinkoff Bank pursuant to Executive Order 14024 and added it to the SDN List for "operating or having operated in the financial services sector of the Russian Federation economy." Despite being aware that the funds originated at Tinkoff Bank, in or about December 2023, GUGNIN facilitated six wire transfers totaling approximately $45,000.00 from an account held at Bank 1 in Florida to an account held at a bank in California and controlled by the California-based company.

                e.      <u>Payment to Russian Provider of Dental Technologies and Implants</u>

        53.      On or about August 15, 2023, the defendant IURII GUGNIN agreed to facilitate a $46,563.00 U.S. dollar payment on behalf of Yiwu Vortex to a Russian provider of dental technologies and implants. The funds for this payment originated at OFAC-sanctioned VTB Bank. Despite being aware that the funds originated at VTB Bank, on or about August 17, 2023, GUGNIN made an approximately $46,563.00 international wire transfer from Evita Investments' account held at a U.S. bank ("Bank 5") to an account held at an Israeli bank, which passed through the Eastern District of New York.

               ii.      <u>Payment from Russia to Estonia</u>

        54.      On or about September 26, 2024, a co-conspirator ("CC-1") emailed the defendant IURII GUGNIN, requesting assistance in transferring funds from CC-1's personal bank account at OFAC-sanctioned Sberbank to an Ireland-based bank account controlled by CC-1's business in Estonia. CC-1 explained that he had attempted to transfer the funds through a Russian money transmission service, but Sberbank rejected the payment due to a "high risk of fraud." In response, on or about October 3, 2024, GUGNIN converted approximately $3,322.00 in U.S. dollars into approximately 3,000.00 Euros and then remitted the approximately 3,000.00 Euros to CC-1's Estonian company.

     iii.       The Defendant's Personal Use of Alfa-Bank and Sberbank

     55.     In addition to facilitating transactions involving sanctioned banks on behalf of his customers, the defendant IURII GUGNIN also personally used services provided by Sberbank and JSC Alfa-Bank ("Alfa-Bank") while residing in the United States.   With respect to both banks, GUGNIN transacted with them despite knowing that they were subject to OFAC sanctions.

     a.     Alfa-Bank

     56.     On or about May 16, 2016, the defendant IURII GUGNIN opened an account at Alfa-Bank.   Thereafter, on or about April 6, 2022, OFAC designated Alfa-Bank pursuant to Executive Order 14024 and added it to the SDN list for "operating or having operated in the financial services sector of the Russian Federation economy."   In or about and between July 29, 2022, and December 28, 2022—while GUGNIN resided in the United States— GUGNIN used his Alfa-Bank account for approximately 44 separate transactions.   In addition, on or about April 18, 2023, GUGNIN responded to an email from an Alfa-Bank representative and asked, in sum and substance, whether Alfa-Bank's system would automatically repay GUGNIN's loan balance if he added 719,706.16 RUB to his account.

     57.     On or about March 9, 2023, GUGNIN conducted a web search for "alfa bank sanctions Washington dc court."   Thereafter, in or about and between April 2023 and April 2024, GUGNIN visited websites and conducted web searches indicating that he continued to use Alpha-Bank, including, on or about April 29, 2023, searching "how to download the alpha bank app"; on or about May 8, 2023, searching "alpha bank where to download for iphone" and visiting a .ru webpage titled "Alfa Bank has released a new application for iPhone Money . . . ";

24

and on or about May 2, 2024, visiting a website titled "Alfa-Bank credit and debit cards, loans . . . ."

             b.    <u>Sberbank</u>

       58.    Since at least on or about December 23, 2021, the defendant IURII GUGNIN has also had an account at Sberbank.   From in or about and between May 2023 and March 2024—after full blocking sanctions against Sberbank had gone into effect and while GUGNIN was residing in the United States—GUGNIN made at least six payments from his Sberbank account.   Specifically, GUGNIN made five payments to an operator of a chain of beauty stores in Yekaterinburg, Russia for amounts ranging between approximately 15,000.00 RUB and approximately 25,000.00 RUB.   In addition, GUGNIN made a sixth payment from his Sberbank account of approximately 49,995.00 RUB to an individual with a .ru email address.

       59.    Prior to the above Sberbank transactions, on or about March 2, 2022, GUGNIN received an e-mail with the subject "west forces SWIFT to ban Russian banks, collateral impact of sanctions on EU/global banks, Has the RMB become a safe-haven currency?"   The e-mail contained a news article that described Western sanctions targeting Russian banks, and specifically referenced sanctions against Sberbank.   Furthermore, on or about June 8, 2023, GUGNIN conducted a Google search for "swift sanctions Russia."   Previously, on or about June 3, 2022, Sberbank had been removed from the SWIFT international payment system as part of a package of European Union sanctions.

       60.    As with Alfa-Bank, the defendant IURII GUGNIN visited websites demonstrating his continued use of Sberbank while residing in the United States.   This included, on or about November 14, 2022, visiting the "Sberbank for international customers" section of

Sberbank's website, and, on or about November 29, 2024, visiting a section of Sberbank's website that described how to put money onto an Sberbank card.

      C.    Scheme to Evade Export Controls

          61.    In addition to facilitating payments from OFAC-sanctioned Russian bank accounts, the defendant IURII GUGNIN also used Evita to facilitate the purchase of export-controlled items by Russia-based end-users, including by obfuscating invoices.

         i.    Payment for Export of Controlled Rack Server

          62.    On or about April 15, 2024, the defendant IURII GUGNIN facilitated the purchase by a Russian customer of an export-controlled rack server manufactured by a U.S. technology company ("U.S. Technology Company 1"). Specifically, on or about April 15, 2024, GUGNIN sent an approximately $81,380.00 international bank transfer from Evita Investments' account held at Bank 2 in New York, New York to an account held at Bank 2 in Hong Kong and controlled by a Hong Kong-based entity. That international bank transfer moved through the Eastern District of New York. The payment was for the purchase of a U.S. Technology Company 1-manufactured rack server, which was controlled under ECCN 5A992.c for anti-terrorism reasons. At the time, it was unlawful to export or re-export the rack server to Russia without a license from the Department of Commerce.

          63.    The defendant IURII GUGNIN's email and cloud storage account contained an invoice related to the transaction, dated on or about March 12, 2024, which showed that the true end user of the rack server was not the Hong Kong-based entity, but instead a company located in Moscow, Russia. Specifically, the invoice's metadata indicated that it had been obfuscated to conceal that the true end-user of the product was a Moscow, Russia-based information technology company that specialized in system integration, cloud computing, and

26

artificial intelligence.   The invoice had last been modified on or about April 11, 2024, four days prior to GUGNIN making the payment to the Hong Kong-based entity.

64.     On or about April 15, 2024, the same day the defendant IURII GUGNIN sent the approximately $81,380.00 payment to the Hong Kong-based entity for the rack server, GUGNIN conducted web searches demonstrating his knowledge of the true end user and the possibility that the payment violated sanctions.   At approximately 1:13 PM, GUGNIN searched the name of the Hong Kong-based entity, followed by the word "sanctions."   Approximately two minutes later, GUGNIN searched the name of the actual end user, the Moscow-based information technology company.

65.     The defendant IURII GUGNIN's search and web browser history also revealed that he was aware of U.S. export control laws—including with respect to Russia—prior to making the payment for the rack server.   On or about July 11, 2023, GUGNIN visited a section of BIS's website where a PDF could be downloaded titled "BIS Guidance to Prevent Evasion of Prioritized Harmonized System Codes to Russia Final."   On or about March 28, 2024, GUGNIN visited a section of BIS's website titled "Russia Export Controls – List of Common High-Priority Items."   And on or about April 9, 2024, GUGNIN visited a section of BIS's website titled "Deemed Exports FAQs – Russia Oil and Gas Sanctions."

ii.     Attempted Payment for Controlled Router

66.     On or about May 14, 2024, the defendant IURII GUGNIN attempted to facilitate the purchase and export of controlled routers manufactured by another U.S. technology company ("U.S. Technology Company 2").   Specifically, on or about May 14, 2024, GUGNIN sent approximately $383,073.83 via an international wire transfer from Evita Investments' account held at Bank 2 to an account held at a bank in Almaty, Kazakhstan and controlled by a

27

Cyprus-based company. The wire transfer was processed through a correspondent account at another New York-based bank and passed through the Eastern District of New York. The wire transfer was payment for the purchase of nine units of a router manufactured by U.S. Technology Company 2, which was controlled under ECCN 5A002.a for anti-terrorism and national security reasons. At the time, the routers required a license from the Department of Commerce to be exported or re-exported to Russia.

        67.     The same day the defendant IURII GUGNIN sent the wire transfer, he conducted web searches for the name of the Cyprus-based company followed by the word "sanctions." He also visited a webpage that contained export data for the Cyprus-based company, including data indicating that the company had previously exported 1,942 shipments with a total value of approximately $83,260,000.00 U.S. dollars. According to the export data viewed by GUGNIN, each of the 1,942 shipments was subsequently re-exported from the Cyprus-based company to a Russia-based information technology distributor. Thus, GUGNIN was aware that the Cyprus-based company was effectively a procurement front for the Russia-based information technology distributor. GUGNIN conducted a web search for the name of the Russia-based information technology distributor, and visited the "About Us" section of its website, which stated that the company was "one of the largest broad-line IT-distributors in Russia and CIS" and "has offices in Saint Petersburg and Moscow." GUGNIN then searched for the name of the Russia-based information technology distributor followed by the word "sanctions." GUGNIN also visited a webpage containing information about the Russia-based information technology distributor from an open-source database, which stated that the Russian entity was partially owned by a particular Russian national. After visiting that page, GUGNIN searched the name of the Russian national followed by the word "sanctions."

28

68.     Thereafter, on or about May 20, 2024, the defendant IURII GUGNIN sent another wire transfer—for approximately $708,719.15—from Evita Investments' account held at Bank 2 to the account held at the bank in Almaty, Kazakhstan and controlled by the Cyprus-based company.   The wire transfer again was processed through a correspondent account in New York and passed through the Eastern District of New York.   The wire description stated that it was for "SPARE PARTS."

69.     On or about May 30, 2024, both the May 14, 2024, and May 20, 2024 wire transfers to the Cyprus-based company were returned for an unspecified reason.

iii.     Procurement of Controlled Microelectronics by Russia-based Individual

70.     The defendant IURII GUGNIN also facilitated a Russia-based co-conspirator's ("CC-2") purchase of technology from a U.S. technology company ("U.S. Technology Company 3") while hiding CC-2's true employer and location in Russia. Specifically, on or about and between May 9, 2024, and October 28, 2024, Evita Investments placed and received 11 orders of microelectronics from U.S. Technology Company 3.   The 11 orders pertained to 161 unique part numbers, some of which were controlled under ECCNs 5A992.c and 5A991.g for antiterrorism and regional stability reasons.   At the time, a license was required to export all items with ECCNs 5A992.c and 5A991.g to Russia.

(a)     For example, on or about July 11, 2024, Evita Investments placed an order with U.S. Technology Company 3 for approximately 45 units of three separate controlled parts, including a development board and two types of radio frequency switches.   On or about July 19, 2024, these parts were shipped from U.S. Technology Company 3 to an Evita Investments address in Hong Kong.   Evita Investments paid for the items, and listed its business address as GUGNIN's residence in New York, New York.   U.S. Technology Company 3's only

point of contact for Evita Investments was CC-2, who held themself out as an employee of Evita Investments. CC-2 was listed on each invoice for the shipments from U.S. Technology Company 3 and communicated extensively with U.S. Technology Company 3's employees, including to request the components and coordinate payment and shipment.

           (b)     However, rather than reside in the United States (where Evita Investments listed its business address), or Hong Kong (where the goods were shipped), CC-2 resided in Russia. A social media profile for CC-2 indicated that, as of on or about January 13, 2025, CC-2 lived in Saint Petersburg, Russia. Moreover, the social media profile indicated that CC-2 was a "Senior Supply Chain Manager" at a Russia-based logistics company. According to the company's website, it connects Russian businesses with foreign suppliers and helps the Russian businesses pay for and receive goods from the suppliers.

           71.     A ledger maintained by the defendant IURII GUGNIN of transactions with a Russian money transfer service reflected several transactions involving U.S. Technology Company 3, including transactions for parts with ECCNs 5A992.c. In addition, on or about August 6, 2024, GUGNIN conducted a web search for "Memory devices classified under ECCN 5A992.c or designated EAR99."

        D.     Scheme to Violate the Bank Secrecy Act

           72.     The defendant IURII GUGNIN violated the Bank Secrecy Act and its implementing regulations in multiple ways. This included, among other things, (1) operating Evita to transmit funds GUGNIN knew were derived from criminal offenses and that supported unlawful activity, (2) failing to implement Evita's own purported AML programs; and (3) failing to file suspicious activity reports when required.

     i.     Operation of Evita as a Money Transmitting Business that Dealt in Criminal Funds

73.     The defendant IURII GUGNIN operated Evita as a money transmitting business since at least in or about April 2023. In that time, he never registered Evita Investments with FinCEN or any state regulator.

74.     On or about June 23, 2023, the defendant IURII GUGNIN registered Evita Pay—but not Evita Investments—as an MSB with FinCEN. Approximately one year later, on or about June 4, 2024, GUGNIN registered Evita Pay as a money transmitter with Florida state authorities. By that point, however, GUGNIN had already facilitated more than $140 million worth of payment transactions through Evita Investments. GUGNIN intentionally concealed the overlapping business purposes of Evita Investments and Evita Pay to shield Evita Investments— which, as noted, was not registered as an MSB—from the additional scrutiny routinely applied to licensed money transmitters and providers of currency exchange services.

75.     As alleged above, the defendant IURII GUGNIN facilitated U.S. dollar-transactions on behalf of overseas customers through stablecoin wallets at cryptocurrency exchanges he kept and maintained in Evita Investments' and Evita Pay's names. For example, on or about December 13, 2023, GUGNIN received approximately $803,347.00 USDT from a customer with the initials "TI." GUGNIN then converted approximately $43,450.00 of this USDT to U.S. dollars through Evita Investments' account at Cryptocurrency Exchange 1. Once the funds were in U.S. dollars, GUGNIN transferred the funds to Evita Investments' account held at Bank 1. Immediately thereafter, GUGNIN transferred the approximately $43,450.00 in U.S. dollars from Evita Investments' account held at Bank 1 to a company based in Long Island, New York, as payment on behalf of GUGNIN's client "TI."

76.     As further examples, on or about June 10, 2023, the defendant IURII
GUGNIN facilitated an approximately $20,000 payment by an Estonian company to a Maldives-
based yacht broker by sending the funds to an account at a bank located in Queens, New York.
On or about March 4, 2024, GUGNIN facilitated an approximately $71,473.28 payment to a
Canadian car dealer, with the payment going to the car dealer's account at the same Queens-
based bank.  And on or about April 8, 2024, GUGNIN facilitated an approximately $7,000
payment to a car dealer in Florida on behalf of an individual located in Moscow, Russia.  The
purpose of the payment was to facilitate a shipment by a freight forwarder located in Queens,
New York.

77.     The above-described transactions are among the hundreds of transactions
the defendant IURII GUGNIN engaged in as a money transmitter, which he undertook for more
than a year before obtaining the required licenses for Evita Pay.  Even upon obtaining licenses
for Evita Pay in or about June 2024, GUGNIN continued to use Evita Investments as his primary
business vehicle.  To date, GUGNIN has not registered Evita Investments as an MSB, despite
the fact that Evita Investments accounts for the majority of Evita's total transactional volume.
As explained above, GUGNIN knew that the funds transmitted by Evita were derived from
criminal offenses and supported unlawful activity, including the evasion of sanctions and export
controls and the defrauding of banks and cryptocurrency exchanges.

78.     To effectuate his scheme and avoid regulatory oversight, the defendant
IURII GUGNIN also concealed the nature of Evita Investments' activities from third parties.
This included making false and conflicting statements about whether Evita Investments was
required to register as a money transmitter at all.  For example, on or about May 9, 2023,
GUGNIN provided a signed due diligence questionnaire to representatives at Cryptocurrency

Exchange 1 to facilitate the opening of an account for Evita Investments.   The due diligence

questionnaire asked GUGNIN to indicate whether his business offered certain products, such as

money transmission and cryptocurrency exchange services.   GUGNIN certified that Evita

Investments provided both money transmission and currency exchange services.   After being

prompted by Cryptocurrency Exchange 1's customer support to indicate Evita Investments'

exemption from licensing with FinCEN and other regulatory entities, GUGNIN provided a letter

that stated that "[i]n some transactions, we act as a 3(c)(7) exemption US private hedge fund, to

help our community members invest in advanced products . . . ."   This statement was false.   As

outlined above, Evita Investments does not operate as a "private hedge fund" or other regulated

investment vehicle.

        79.     On or about January 24, 2024, the defendant IURII GUGNIN offered a

different—but still false—explanation to Cryptocurrency Exchange 2.   In a letter GUGNIN

provided to Cryptocurrency Exchange 2 to facilitate the opening of an account for Evita

Investments, GUGNIN falsely characterized Evita Investments as a business-to-business lender

and importer-exporter, "not a payment provider."   GUGNIN claimed that such "factoring"

companies and business-to-business lenders were "self-regulated" and therefore did not require a

license from FinCEN.   Contrary to GUGNIN's representations, Evita Investments in fact was a

payment provider.   As outlined above, Evita Investments received funds from customers in fiat

currencies or cryptocurrencies, exchanged the funds into other currencies, and then made

purchases on behalf of clients for various products and services, all as part of a scheme to evade

sanctions and export controls and defraud financial institutions.

ii.     Failure to Implement an Effective Anti-Money-Laundering Program

80.     The defendant IURII GUGNIN also failed to implement an effective AML

compliance program, including by failing to comply with Evita's own purported KYC policy.

81.     The defendant IURII GUGNIN claimed Evita Investments and Evita Pay

maintained robust AML/KYC policies, which were posted to Evita's website and which

GUGNIN provided to multiple cryptocurrency exchanges to induce them to open institutional

accounts.   These AML/KYC policies were typically signed by GUGNIN himself.   The policies

stated, for example, that Evita was prohibited from doing business with customers located in

Russia and several other countries, as well as with sanctioned entities.   They also stated that

Evita required all prospective natural person customers to provide, among other things, their full

legal name, date of birth, an image of their government-issued identification document, their

residential address, and their identification number.   For business customers, Evita purportedly

required the customers to disclose their full legal name, the state and country of their formation,

their date of formation, their tax identification/registration number, their physical address, the

nature of their business, information about their authorized representatives, information about the

ultimate beneficial owners of the customer, an explanation for why the customer needed an

account, utility or bank statements verifying the customer's address, documents verifying the

existence of the customer, and other information.

82.     In communications with cryptocurrency exchanges, the defendant IURII

GUGNIN highlighted Evita's purported robust compliance policies.   For example, on or about

January 25, 2024, GUGNIN stated to U.S. Cryptocurrency Exchange 2 that all of Evita's

customers' wallets and bank accounts were pre-approved for making both deposits and

withdrawals, and that he worked only with a "highly curated small network of friends-of-

friends."   Similarly, on or about July 30, 2024, GUGNIN provided an AML compliance document to Cryptocurrency Exchange 1 that stated that "every outgoing and incoming wire or crypto transaction is checked according to the KYC/AML policy, including clients and recipients, to whom Evita pays."   And on or about May 10, 2023, GUGNIN provided a compliance document to Cryptocurrency Exchange 1, which stated that all of Evita Investments' customers and related parties were screened against the following sanctions lists: OFAC's SDN List, OFAC non-SDN lists, European Union sanctions lists, United Nations sanctions lists, and UK His Majesty's Treasury sanctions lists.   The documents also stated that Evita Investments' customers were screened whenever those sanctions lists were updated.

83.     Contrary to these policies and statements, the defendant IURII GUGNIN willfully conducted substantial business with customers in Russia and dealt in funds subject to blocking sanctions by OFAC.   Many of these transactions involved wire transfers that passed through the Eastern District of New York, several of which are described above.

84.     In addition, as noted, the defendant IURII GUGNIN routinely falsified invoices to obfuscate the Russian end users of purchased goods.   In his email and cloud storage account, GUGNIN maintained more than 80 invoices related to transactions by Evita for which the invoices were intentionally obfuscated.   Specifically, the metadata associated with the invoices showed that GUGNIN had digitally "whited out" the name, address, and other information associated with the end users—all of which were located in Russia—after the invoices' creation.

85.     The defendant IURII GUGNIN's internet activity confirmed his awareness that he was breaking the law.   In or about and between October 2023 and April 2024, GUGNIN conducted web searches for, among other things, "how to know if there is an investigation

35

against you"; "evita investments inc. criminal records search"; "Iurii Gugnin criminal records"; "money laundering penalties US"; and "penalties for sanctions violations EU luxury goods." On or about March 21, 2024, GUGNIN visited website pages titled, respectively, "am I being investigated?"; "signs you may be under criminal investigation"; and "what are the best ways to find out if you're being investigated and what can someone do when they think they might be under investigation."

        iii.      Failure to File Suspicious Activity Reports

        86.      In addition to disregarding Evita's own supposed compliance controls, the defendant IURII GUGNIN also failed to file suspicious activity reports as required by law.

        87.      For example, on or about November 16, 2023, the defendant IURII GUGNIN, using an Evita Investments wallet hosted by Cryptocurrency Exchange 1, received approximately $189,737.55 worth of USDT from a wallet associated with the OFAC-sanctioned Russian cryptocurrency exchange Garantex.[4]  On the same day, GUGNIN transferred a larger sum of USDT—which included the funds from Garantex—into a different account at Cryptocurrency Exchange 1.  Later that day, GUGNIN converted this sum of USDT into U.S. dollars at Cryptocurrency Exchange 1 and wired the funds into an account held at Bank 1 in New York, New York.

        88.      The defendant IURII GUGNIN failed to file a suspicious activity report despite being aware that Evita Investments had obtained funds from Garantex.  Specifically, in or about April 2024, representatives from Cryptocurrency Exchange 2, which hosted multiple

---

       [4]      On or about April 5, 2022, Garantex was added to OFAC's SDN list for, among other things, engaging in "$100 million in transactions . . . associated with illicit actors and darknet markets."

cryptocurrency wallets on behalf of Evita Investments, were notified via a third-party AML

auditor that one of GUGNIN's Evita Investments wallets had received funds from Garantex.

Cryptocurrency Exchange 2 representatives called GUGNIN to alert him to the issue.   During

the phone call, GUGNIN confirmed that he had conducted business with Garantex and indicated

that he would refrain from doing so in the future.   On or about April 15, 2024, Cryptocurrency

Exchange 2's Chief Executive Officer messaged GUGNIN via an encrypted messaging platform

to inform him that the Garantex-associated wallet would be closed, and that a new, "clean"

wallet would be created for his use.   Despite GUGNIN's knowledge of the Garantex transaction,

he did not file a suspicious activity report regarding his receipt of sanctioned funds.

89.    The defendant IURII GUGNIN also instructed representatives of

Cryptocurrency Exchange 2 to structure wire transfers to an account held at Bank 2 in New

York, New York to avoid the bank's AML flags.   Specifically, on or about May 17, 2024, in an

encrypted chat with representatives of Cryptocurrency Exchange 2, GUGNIN stated "It looks

like everything above $1.5M goes to manual compliance in [Bank 2]…so, [Bank 2] sees the

incoming $1.5m, and it's on the manual review…so, next time I will cut incoming wires by

$1.25m each."   Following this statement to Cryptocurrency Exchange 2, GUGNIN began

directing Cryptocurrency Exchange 2 to structure wire payments to Bank 2 on his behalf.   For

instance, on or about July 17, 2024, GUGNIN sent a message to representatives of

Cryptocurrency Exchange 2 that read: "USDT 1,894,000 to dollars. PLEASE SPLIT INTO

TWO WIRES: 957,000 937,000."   In response to GUGNIN's message, a representative of

Cryptocurrency Exchange 2 sent GUGNIN two messages; one that said "sure," and another that

said "done."   On or about that same date, Cryptocurrency Exchange 2 sent two wire transfers in

the approximate amounts of $956,330.10 and $936,344.10, respectively, from an account held at

a bank branch in Fargo, North Dakota, to an account held at Bank 2 in New York, New York, which passed through the Eastern District of New York. GUGNIN did not file a suspicious activity report with respect to any of these transactions intentionally structured to avoid Bank 2's AML compliance review.

90. Additional examples of suspicious and unlawful transactions for which the defendant IURII GUGNIN did not file suspicious activity reports—including transactions involving blocked funds and the procurement of sensitive technology—are outlined above.

COUNT ONE
(Wire Fraud Conspiracy)

91. The allegations contained in paragraphs one through 90 are realleged and incorporated as if fully set forth in this paragraph.

92. In or about and between April 2023 and the date of this Indictment, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IURII GUGNIN, also known as "Iurii Mashukov" and "George Goognin," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud one or more U.S. companies, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: electronic communications, emails and other online communications and monetary transfers in and through the Eastern District of New York and elsewhere, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 *et seq.*)

COUNTS TWO THROUGH FOUR
(Wire Fraud)

93.     The allegations contained in paragraphs one through 90 are realleged and

incorporated as if fully set forth in this paragraph.

94.     On or about the dates set forth below, within the Eastern District of New

York and elsewhere, the defendant IURII GUGNIN, also known as "Iurii Mashukov" and

"George Goognin," together with others, did knowingly and intentionally devise a scheme and

artifice to defraud the U.S. companies set forth below, and to obtain money and property from

them by means of one or more materially false and fraudulent pretenses, representations and

promises, and for the purpose of executing such scheme and artifice, IURII GUGNIN, together

with others, did knowingly and intentionally transmit and cause to be transmitted by means of

wire communication in interstate commerce, one or more writings, signs, signals, pictures and

sounds, as set forth below.

| COUNT | APPROXIMATE DATE | WIRE COMMUNICATION | VICTIM |
|---|---|---|---|
| TWO | November 23, 2023 | International wire transfer in the approximate amount of $184,462.60 from a bank branch in New York, New York, to a bank account held abroad | Cryptocurrency Exchange 1 |
| THREE | August 22, 2024 | International wire transfer in the approximate amount of $50,149.70 from a bank branch in New York, New York, to a bank account held abroad | Cryptocurrency Exchange 2 |
| FOUR | October 3, 2024 | International wire transfer in the approximate amount of $39,034.27 from a bank branch in New York, New York, to a bank account held abroad | Payments Company 3 |

(Title 18, United States Code, Sections 1343, 2, and 3551 *et seq.*)

COUNTS FIVE AND SIX
(Bank Fraud)

95.     The allegations contained in paragraphs one through 90 are realleged and incorporated as if fully set forth in this paragraph.

96.     In or about and between the dates set forth below, those dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IURII GUGNIN, also known as "Iurii Mashukov" and "George Goognin," together with others, did knowingly and intentionally execute schemes to defraud the financial institutions set forth below, and to obtain moneys, funds, credits and other property owned by, and under the custody and control of, such financial institutions by means of materially false and fraudulent pretenses, representations and promises.

| COUNT | APPROXIMATE DATES | FINANCIAL INSTITUTION |
|-------|-------------------|------------------------|
| FIVE | October 2023 to the date of this Indictment | Bank 1 |
| SIX | December 2023 to the date of this Indictment | Bank 2 |

(Title 18, United States Code, Sections 1344, 2, and 3551 *et seq.*)

COUNT SEVEN
(Conspiracy to Defraud the United States)

97.     The allegations contained in paragraphs one through 90 are realleged and incorporated as if fully set forth in this paragraph.

98.     In or about and between July 2022 and the date of this Indictment, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IURII GUGNIN, also known as "Iurii Mashukov" and "George Goognin," together with others, did knowingly and willfully conspire to defraud the United States by

40

impairing, impeding, obstructing and defeating, through deceitful and dishonest means, the

lawful functions of OFAC and BIS, both agencies of the United States, in the enforcement of

export control and economic sanctions laws and regulations, and the issuance of licenses relating

to the export of goods and provision of financial services.

99.     In furtherance of the conspiracy and to effect its objects, within the

Eastern District of New York and elsewhere, the defendant IURII GUGNIN, together with

others, did commit and cause the commission of, among others, the following:

OVERT ACTS

(a)     On or about April 18, 2023, GUGNIN responded to an email from

an Alfa-Bank representative and asked, in sum and substance, whether Alfa-Bank's system

would automatically repay GUGNIN's loan balance if he added 719,706.16 RUB to his account.

(b)     On or about October 3, 2023, GUGNIN provided a false on-

boarding application to Cryptocurrency Exchange 2 that indicated that Evita Investments did not

transact with Russia.

(c)     On or about October 16, 2023, GUGNIN entered into a contract

with Yiwu Vortex that permitted Evita Investments, for a fee, to send and receive payment on

Yiwu Vortex's behalf.

(d)     On or about December 20, 2023, GUGNIN provided false answers

to a sanctions due diligence questionnaire indicating that Evita Investments did not "conduct

business activity in, or have indirect exposure to" Russia.

(e)     On or about February 15, 2024, GUGNIN signed a contract to

make a $85,023.28 U.S. dollar payment on behalf of Yiwu Vortex to a China-based company

using funds that originated at VTB Bank.

41

(f)       On or about April 29, 2024, GUGNIN sent approximately
$85,023.28 U.S. dollars via international bank transfer from an account held at Bank 2 in New
York, New York, through the Eastern District of New York, to an account held at Bank 2 in
Singapore.

(g)       On or about February 15, 2024, GUGNIN signed a contract to
facilitate a $64,082.00 payment on Yiwu Vortex's behalf to a Türkiye-based company using
funds that originated at VTB Bank.

(h)       On or about February 19, 2024, GUGNIN sent approximately
$64,082.00 via international wire transfer from an account held at Bank 2 in New York, New
York, to an account held at a bank in Türkiye, via a correspondent account at another New York-
based bank, which passed through the Eastern District of New York.

(i)       On or about March 21, 2024, the director of Yiwu Vortex sent an
email to GUGNIN discussing a payment from Sberbank.

(j)       On or about March 25, 2024, GUGNIN sent approximately
104,860.00 USDT to a wallet hosted by Cryptocurrency Exchange 2.

(k)       On or about March 25, 2024, GUGNIN sent an approximately
$100,000 international wire transfer from an account held at Bank 2 to an account held at a bank
in South Korea, which passed through the Eastern District of New York.

(l)       On or about March 28, 2024, GUGNIN sent an approximately
$1,054,280 international wire transfer from an account held at Bank 2 to an account held at a
bank in South Korea, which passed through the Eastern District of New York.

(m)     On or about April 15, 2024, GUGNIN sent an approximately $81,380.00 bank transfer from Evita Investments' account held at Bank 2, through the Eastern District of New York, to an account held at Bank 2 in Hong Kong.

(n)     On or about May 14, 2024, GUGNIN sent an approximately $383,073.83 international wire transfer from Evita Investments' account held at Bank 2 to an account held at a bank in Almaty, Kazakhstan, which transfer was processed by a New York-based correspondent account and moved through the Eastern District of New York.

(o)     On or about May 20, 2024, GUGNIN sent an approximately $708,719.15 international wire transfer from Evita Investments' account held at Bank 2 to an account held at a bank in Almaty, Kazakhstan, which transfer was processed by a New York-based correspondent account and moved through the Eastern District of New York.

(p)     On or about July 19, 2024, GUGNIN provided KYC/AML documentation to Payments Company 3 that indicated that Evita Investments did not do business with customers in Russia.

(q)     On or about July 11, 2024, CC-2 placed an order with U.S. Technology Company 3 for approximately 45 units of three export-controlled parts, including a development board and two types of radio frequency switches.

(r)     On or about October 3, 2024, GUGNIN transferred 3,000 Euros to CC-1's Estonian company.

(Title 18, United States Code, Sections 371 and 3551 *et seq.*)

COUNT EIGHT
(Conspiracy to Violate IEEPA)

100.    The allegations contained in paragraphs one through 90 are realleged and incorporated as if fully set forth in this paragraph.

101. In or about and between July 2022 and the date of this Indictment, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IURII GUGNIN, also known as "Iurii Mashukov" and "George Goognin," together with others, did knowingly and willfully conspire to violate, and to cause a violation of, one or more licenses, orders, regulations, and prohibitions issued under IEEPA, contrary to Title 50 United States Code, Section 1705, Executive Order 14024, and 31 C.F.R. § 587.201.

102. It was a part and an object of the conspiracy that the defendant IURII GUGNIN, a U.S. person, together with others, knowingly and willfully made a contribution and provision of funds, goods, and services by, to, and for the benefit of, and received a contribution or provision of funds, goods, or services from Sberbank, Sovcombank, VTB Bank, and Tinkoff Bank, and caused U.S. persons, entities and financial institutions to do the same, without first obtaining the required approval of OFAC, contrary to Executive Order 14024 and Title 31, Code of Federal Regulations, Section 587.201; and engaged in transactions to evade, and for the purpose of evading, the prohibitions set forth in Executive Order 14024 and Title 31, Code of Federal Regulations, Section 587.201.

(Title 50, United States Code, Sections 1705(a) and 1705(c); Title 18, United States Code, Sections 3551 *et seq.*)

## COUNTS NINE AND TEN
(Violation of IEEPA)

103. The allegations contained in paragraphs one through 90 are realleged and incorporated as if fully set forth in this paragraph.

104. In or about and between the dates set forth below, those dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IURII GUGNIN, also known as "Iurii Mashukov" and "George Goognin," together with others,

44

did knowingly and willfully violate, attempt to violate, and cause a violation of, one or more

licenses, orders, regulations, and prohibitions issued under IEEPA, and the regulations

promulgated thereunder, as described below, without first obtaining the required approval of

OFAC, contrary to Title 50, United States Code, Section 1705, Executive Order 14024, and Title

31, Code of Federal Regulations, Section 587.201.

| COUNT | APPROXIMATE DATE | TRANSACTION | APPROXIMATE AMOUNT |
|-------|------------------|-------------|--------------------|
| NINE | March 25, 2024 | GUGNIN, a U.S. person, facilitated the transaction of RUB held in a Yiwu Vortex account at Sberbank exchanged to U.S. dollars via Cryptocurrency Exchange 2 and Bank 2 | $100,000 |
| TEN | March 28, 2024 | GUGNIN, a U.S. person, facilitated the transaction of RUB held in a Yiwu Vortex account at Sberbank exchanged to U.S. dollars via Cryptocurrency Exchange 2 and Bank 2 | $1,054,280 |

(Title 50, United States Code, Sections 1705(a) and 1705(c); Title 18, United

States Code, Sections 2 and 3551 *et seq.*)

### COUNT ELEVEN
(Operating an Unlicensed Money Transmitting Business)

105.    The allegations contained in paragraphs one through 90 are realleged and

incorporated as if fully set forth in this paragraph.

106.    In or about and between April 2023 and the date of this Indictment, both

dates being approximate and inclusive, within the Eastern District of New York and elsewhere,

the defendant IURII GUGNIN, also known as "Iurii Mashukov" and "George Goognin,"

together with others, did knowingly and intentionally conduct, control, manage, supervise, direct,

and own all or part of an unlicensed money transmitting business affecting interstate and foreign

45

commerce, to wit: Evita, which otherwise involved the transportation and transmission of funds

known to GUGNIN to have been derived from a criminal offense and intended to be used to

promote and support unlawful activity.

(Title 18, United States Code, Sections 1960(b)(1)(C), 2, and 3551 *et seq.*)

## COUNT TWELVE
(Failure to Implement an Effective Anti-Money Laundering Program)

107.    The allegations contained in paragraphs one through 90 are realleged and
incorporated as if fully set forth in this paragraph.

108.    In or about and between April 2023 and the date of this Indictment, both

dates being approximate and inclusive, within the Eastern District of New York and elsewhere,

the defendant IURII GUGNIN, also known as "Iurii Mashukov" and "George Goognin,"

together with others, did willfully fail to establish, develop, implement, and maintain an effective

AML program at Evita as required by law, to wit: GUGNIN, among other things, failed to

implement an effective AML program at Evita that was commensurate with the risks posed by

the location and size of, and the nature and volume of the money services provided by, Evita;

and failed to implement policies, procedures, and internal controls reasonably designed to assure

compliance with the Bank Secrecy Act, as part of a pattern of any illegal activity involving more

than $100,000 in a 12-month period, contrary to Title 31, United States Code, Sections 5318(h),

5322(a), and 5322(b), and regulations issued thereunder, to wit: Title 31, Code of Federal

Regulations, Section 1022.210.

(Title 31, United States Code, Sections 5318(h), 5322(a), and 5322(b); United

States Code, Sections 2 and 3551 *et seq.*)

46

COUNTS THIRTEEN THROUGH SIXTEEN
(Failure to File Suspicious Activity Reports)

109.    The allegations contained in paragráphs one through 90 are realleged and incorporated as if fully set forth in this paragraph.

110.    On or about the dates identified below, within the Eastern District of New York and elsewhere, the defendant IURII GUGNIN, also known as "Iurii Mashukov" and "George Goognin," together with others, did willfully fail to file with the U.S. Department of Treasury reports of suspicious transactions relevant to possible violations of law and regulation on behalf of Evita, as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, contrary to Title 31, United States Code, Sections 5318(g), 5322(a), and 5322(b), and regulations issued thereunder, to wit: Title 31, Code of Federal Regulations, Section 1022.320.

| COUNT | APPROXIMATE DATE | SUSPICIOUS TRANSACTION |
|---|---|---|
| THIRTEEN | March 28, 2024 | International wire transfer of approximately $1,054,280.00 from an account held at Bank 2 in New York, New York, to an account held at a bank in South Korea, with the funds originating at Sberbank |
| FOURTEEN | April 15, 2024 | International bank transfer of approximately $81,380.00 from an account held at Bank 2 in New York, New York, to an account held at Bank 2 in Hong Kong, to purchase a rack server on the Commerce Control List |
| FIFTEEN | April 29, 2024 | International wire transfer of approximately $85,023.28 from an account held at Bank 2 in New York, New York to an account held at Bank 2 in Singapore, with the funds originating at VTB Bank |

| COUNT | APPROXIMATE DATE | SUSPICIOUS TRANSACTION |
|-------|------------------|------------------------|
| SIXTEEN | July 17, 2024 | Two wire transfers in the approximate amounts of $956,330.10 and $936,344.10, respectively, from an account held at a bank branch in Fargo, North Dakota, to an account held at Bank 2 in New York, New York, which were intentionally split to avoid triggering Bank 2's AML compliance review |

(Title 31, United States Code, Sections 5318(g), 5322(a), and 5322(b); United States Code, Sections 2 and 3551 *et seq.*)

## COUNT SEVENTEEN
(Money Laundering Conspiracy)

111. The allegations contained in paragraphs one through 90 are realleged and incorporated as if fully set forth in this paragraph.

112. In or about and between April 2023 and the date of this Indictment, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IURII GUGNIN, also known as "Iurii Mashukov" and "George Goognin," together with others, did knowingly and intentionally conspire to:

(a) transport, transmit and transfer monetary instruments and funds from one or more places in the United States to and through one or more places outside the United States, and to one or more places in the United States from and through one or more places outside the United States, (i) with the intent to promote the carrying on of one or more specified unlawful activities, to wit: wire fraud, bank fraud, conspiracy to violate IEEPA, and violation of IEEPA, contrary to Title 18, United States Code, Section 1956(a)(2)(A); and (ii) knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such

48

transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of one or more specified unlawful activities, to wit: wire fraud, bank fraud, conspiracy to violate IEEPA, and violation of IEEPA, and to avoid one or more transaction reporting requirements under state and federal law, contrary to Title 18, United States Code, Section 1956(a)(2)(B); and

        (b)     engage in one or more monetary transactions, within the United States, in criminally derived property of a value greater than $10,000 that was derived from one or more specified unlawful activities, to wit: wire fraud, bank fraud, conspiracy to violate IEEPA, and violation of IEEPA, contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h) and 3551 *et seq*.)

## COUNTS EIGHTEEN THROUGH TWENTY-TWO
(Money Laundering)

113.    The allegations contained in paragraphs one through 90 are realleged and incorporated as if fully set forth in this paragraph.

114.    On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendant IURII GUGNIN, also known as "Iurii Mashukov" and "George Goognin," together with others, did knowingly and intentionally transport, transmit and transfer monetary instruments and funds from one or more places in the United States to and through one or more places outside the United States, and to one or more places in the United States from and through one or more places outside the United States, (i) with the intent to promote the carrying on of one or more specified unlawful activities, to wit: wire fraud, bank fraud, conspiracy to violate IEEPA, and violation of IEEPA, contrary to Title 18, United States Code, Section 1956(a)(2)(A); and (ii) knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of

49

unlawful activity, and knowing that such transportation, transmission and transfer was designed

in whole and in part to conceal and disguise the nature, location, source, ownership and control

of the proceeds of one or more specified unlawful activities, to wit: wire fraud, bank fraud,

conspiracy to violate IEEPA, and violation of IEEPA, and to avoid one or more transaction

reporting requirements under state and federal law, contrary to Title 18, United States Code,

Section 1956(a)(2)(B).

| COUNT | APPROXIMATE DATE | MONETARY TRANSACTION |
|-------|------------------|----------------------|
| EIGHTEEN | August 17, 2023 | International wire transfer of approximately $46,563.00 from an account held at Bank 5 in New York, New York, to an account held at a bank in Israel |
| NINETEEN | February 19, 2024 | International wire transfer of approximately $64,082.00 from an account held at Bank 2 in New York, New York, to an account held at a bank in Türkiye, via a correspondent account at another New York-based bank |
| TWENTY | March 25, 2024 | International wire transfer of approximately $100,000.00 from an account held at Bank 2 in New York, New York, to an account held at a bank in South Korea |
| TWENTY-ONE | March 28, 2024 | International wire transfer of approximately $1,054,280.00 from an account held at Bank 2 in New York, New York, to an account held at a bank in South Korea |
| TWENTY-TWO | April 29, 2024 | International wire transfer of approximately $85,023.28 from an account held at Bank 2 in New York, New York to an account held at Bank 2 in Singapore |

(Title 18, United States Code, Sections 1956(a)(2)(A), 1956(a)(2)(B), 2, and

3551 *et seq.*)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE THROUGH FOUR, SEVEN, AND EIGHT THROUGH TEN

115.    The United States hereby gives notice to the defendant that, upon his

conviction of any of the offenses charged in Counts One through Four, Seven, and Eight through

Ten, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

116.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNTS FIVE AND SIX

117.    The United States hereby gives notice to the defendant that, upon his conviction of either of the offenses charged in Counts Five and Six, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(2), which requires any person convicted of such offenses to forfeit any property constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

118.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      (a)    cannot be located upon the exercise of due diligence;

      (b)    has been transferred or sold to, or deposited with, a third party;

      (c)    has been placed beyond the jurisdiction of the court;

      (d)    has been substantially diminished in value; or

      (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(2) and 982(b)(1); Title 21, United States Code, Section 853(p))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ELEVEN, AND SEVENTEEN THROUGH TWENTY-TWO

119.    The United States hereby gives notice to the defendant that, upon his conviction of any of the offenses charged in Counts Eleven, and Seventeen through Twenty-Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offenses to forfeit any property, real or personal, involved in such offenses, or any property traceable to such property.

120.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      (a)    cannot be located upon the exercise of due diligence;

        (b)    has been transferred or sold to, or deposited with, a third party;

        (c)    has been placed beyond the jurisdiction of the court;

        (d)    has been substantially diminished in value; or

        (e)    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

        (Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

s/
FOREPERSON

By Carolyn Pokorny, Assistant U.S. Attorney,
JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

53